**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| VIRGINIA L. OWENS, | ) | CASE NO. 3:13-cv-02824 |
| | ) | |
| Plaintiff, | ) | JUDGE ZOUHARY |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | VECCHIARELLI |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff, Virginia Owens ("Plaintiff"), challenges the final decision of Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 423, 1381(a).  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

## I.  PROCEDURAL HISTORY

On October 14, 2010, Plaintiff filed her application for SSI, alleging a disability onset date of August 27, 2010.  (Transcript ("Tr.") 20.)  The application was denied initially and upon reconsideration.  (*Id.*)  Plaintiff untimely filed a written request for a hearing on September 7, 2011, with good cause being found for the late filing.  (*Id.*)  On July 13, 2012, an administrative law judge ("ALJ") held Plaintiff's hearing.  (*Id.*)  Plaintiff participated in the hearing, was represented by counsel, and testified.  (*Id.*)  A

vocational expert ("VE") also participated and testified.  (*Id.*)  On July 26, 2012, the ALJ found Plaintiff not disabled.  (Tr. 17.)  On October 29, 2013, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision.  (Tr. 1.)  On December 24, 2013, Plaintiff filed her complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 15, 16, 17.)

Plaintiff asserts the following assignments of error: (1) The ALJ erred in failing to adequately account for Plaintiff's low intellectual functioning; (2) the ALJ erred in failing to adequately account for Plaintiff's marked restriction in maintaining concentration, persistence, or pace; (3) the ALJ erred in evaluating Plaintiff's IQ scores; and (4) the ALJ did not properly consider Plaintiff's obesity in determining her RFC.

## II.   EVIDENCE

### A.   Personal and Vocational Evidence

Plaintiff was born in November 1985 and was 24-years-old on the date she filed her application.  (Tr. 38.)  She had a marginal education and was able to communicate in English.  (*Id.*)  She had no past relevant work.  (*Id.*)

### B.   Medical Evidence

#### 1.   School Reports

Plaintiff's school records from Toledo Public Schools indicate that she underwent intelligence and academic testing (*e.g.*, Wechsler Intelligence Scale for Children- Third Edition ("WISC-III")) to determine her continued eligibility for special education services:

- March 9, 1993: WISC-III verbal, performance, and full scale IQ scores of 84, 83, and 83, respectively.  (Tr. 347.)

2

- January 25, 1995: WISC-III verbal, performance, and full scale IQ scores of 78, 79, and 76, respectively.  (Tr. 347.)

- November 10, 1997: WISC-III verbal, performance, and full scale IQ scores of 76, 81, and 77.  (Tr. 347.)

In November 2003, Gayle Vonderembse, a school psychologist, found that Plaintiff functioned in the below average to borderline range of intellectual functioning. (Tr. 347.)  Regarding her academic functioning, Plaintiff's teachers reported that she exhibited basic reading skills (without comprehension) at the 5th grade level, spelled at about the 4th grade level, and computed basic math at the 5th grade level in February 2003.  (Tr. 343.)  On the Wide Range Achievement Test administered on October 24, 2003, Plaintiff read (words in isolation), spelled, and did arithmetic at the 3rd grade level.  (Tr. 347.)  Plaintiff's Individualized Education Program for her 11th grade year revealed that she read at the 6th grade level and did math at the 5th grade level.  (Tr. 331, 333.)

### 2. Medical and Agency Reports

Plaintiff sought regular medical treatment from Neighborhood Health Association and Southside Community Center.  (Tr. 476-508, 621-629.)  It appears from the record that Plaintiff sought treatment for her medical conditions (*e.g.,* kidney stones, asthma, etc.) predominately through hospital/emergency room visits.  (Tr. 382-422, 429-450, 452-455, 463-469, 596-608, 666-668, 669-675, 676-727, 728-737, 746-751, 795-799, 838, 946-947, 955-961, 964-989, 1001-1024, 1054-1079, 1080-1105, 1106-1111, 1112-1121.)

A May 18, 2007, venous doppler of Plaintiff's right arm revealed thrombosis of

3

her celphalic vein; there was no evidence of deep vein thrombosis.  (Tr. 472.)  A July 28, 2008, *Factor II (Prothrombin) Mutation Analysis Report* showed that she was a carrier for the MTHFR C677T and A1298 mutations that may be associated with an increased risk of hyperhomocysteinemia and venous thrombosis.  (Tr. 768-770.)  A July 25, 2010, polysomnogram was suggestive of obstructive sleep apnea and sleep-related gastroesophageal reflux disease.  (Tr. 754-756).  A July 1, 2011, x-ray of Plaintiff's lumbar spine revealed Grade I anterolisthesis at L5-S1 with narrowing of the L5-S1 intervertebral disc space.  (Tr. 810.)

### a.    Harbor Behavior Healthcare

Plaintiff sought treatment for her mental condition primarily from Harbor Behavior Healthcare ("Harbor").  (Tr. 509-593, 633-644, 648-664, 818-934, 1123-1124.)  Plaintiff had her first meeting with a therapist on May 11, 2007.  (Tr. 582.)  Plaintiff returned for a second counseling session on June 18, 2009.  (Tr. 543.)  She occasionally sought counseling through November 2009.  (Tr. 526, 531, 536-538.)  Plaintiff had a history of noncompliance with treatment at Harbor.  (Tr. 522, 560, 571, 574-575, 593, 633, 637, 639, 642, 840, 861, 877, 883, 898, 931, 992.)

At a January 29, 2010, medication check, Plaintiff reported that she had been out of medication for three weeks; Lori Dewey, clinical nurse specialist (CNS), noted that Plaintiff should have ben out of medication since the end of November had she been taking her medication properly.  (Tr. 522.)  Plaintiff's mood was good.  (Tr. 523.)  She was oriented; her speech was normal; her memory, attention, and concentration were intact; her thought form was logical; her thought content was unremarkable; her cognitive functions were baseline; and her judgment was fair.  (*Id.*)  Ms. Dewey reported

4

that Plaintiff was diagnosed with a major depressive disorder (recurrent, moderate); an anxiety disorder, not otherwise specified (NOS); and borderline intellectual functioning (BIF).  (Tr. 523.)

Plaintiff continued seeking medication checks in February, March, April, May, and July 2010; her mental status exams continued to be objectively unremarkable, as her memory, attention, and concentration were intact.  (Tr. 509-514, 516-525, 633-635, 639-641.)

At her July 26, 2010, medication management visit at Harbor, Plaintiff reported that she had run out of medication. (Tr. 633.)  In addition to the medication check, Michael Rivard, professional certified coach (PCC), conducted a diagnostic assessment and review of Plaintiff's recovery goals.  (Tr. 636-638.)  At the time, Plaintiff was 24-years-old and living independently.  (Tr. 636.)  She reported an increased level of anxiety and symptoms of depression impacted by recent surgical procedures concerning recurrent kidney stones, urinary discomfort, and unregulated diabetes.  (*Id.*)  Plaintiff's affect was bright and her speech was clear and purposeful.  (*Id.*)  She was described as being casually dressed with poor hygiene.  (*Id.*)  She reported ongoing struggles with bills, limited income, food shortages, and a poor social support system.  (*Id.*)  She noted that she graduated high school in 2005 and attended special classes due to limited intellectual abilities.  (*Id.*)  She reported that she had a boyfriend and was close to her mother.  (*Id.*)  Mr. Rivard diagnosed major depressive disorder, recurrent, moderate; anxiety disorder NOS; and BIF.  (Tr. 638.)

At Plaintiff's next medication check on September 30, 2010, she reported that

she had run out of medication and was interested in restarting her medication.  (Tr. 639-641.) At her follow-up visit on December 9, 2010, Plaintiff reported running out of medication and calling in for a refill.  (Tr. 642-644.)  Plaintiff's mental status evaluation continued to remain objectively unremarkable.  (Tr. 643.)  On February 10, 2011, Plaintiff resumed seeking periodic counseling with visits occurring in March, May, June, and September 2011.  (Tr. 656, 660-661, 898, 921, 925.)  At her medication check on March 10, 2011, Plaintiff reported that she was doing well.  (Tr. 657-659.)  Plaintiff continued seeking medication checks in May, June, October, and December 2011, and April and May 2012.  (Tr. 662-664, 822-823, 833-834, 840-841, 845-847, 852-853, 877-878, 894-895, 919-920.)  Plaintiff's last medication check was on May 31, 2012, and was conducted by Carol Krieger, Advance Practice Nurse (APN).  (Tr. 822-823.)  At that time, Plaintiff was alert, cooperative, and clean and casually dressed.  (Tr. 822.)  Her memory, attention, and concentration were intact and her thought form was logical.  (*Id.*)  She denied suicidal ideation, homicidal ideation, paranoid delusions, and obsessions/compulsions.  (*Id.*)  Her insight and judgment were poor.  (*Id.*)

### b.    Melissa Lansa, Psy., and Wei-Chang Hsiao, P.T.

On September 14, 2011, Melissa Lanza, a licensed psychologist, and Wei-Cheng Hsiao, a psychological trainee, conducted a psychological evaluation of Plaintiff at the request of Plaintiff's vocational counselor.  (Tr. 900-906.)  Plaintiff's depression and anxiety symptoms were managed by medication.  (Tr. 901.)  In addition to the clinical interview, the following tests were administered: Wechsler Adult Intelligence Scale-Fourth Edition (WAIS-IV), Wide Range Achievement Test (Combined Form)-Revision 4 (WRAT-4), Beck Depression Inventory (BDI), Beck Anxiety Inventory (BAI),

6

Fundamental Interpersonal Relations Orientation-Behavior (FIRO-B), and Personality Assessment Inventory (PAI).  (Tr. 900-903, 906.)  Plaintiff needed additional explanation to comprehend and follow the verbal and written instructions to perform the testing tasks.  (Tr. 900.)  She was cooperative and responsive to all questions and was open and comfortable with minimal anxiety in mood and affect throughout the testing process.  (*Id.*)  Her attention and concentration were good throughout testing and she was oriented to person, place, and time with no overt indications of psychosis.  (*Id.*)  On the WAIS-IV, Plaintiff obtained a full scale IQ of 68.  (Tr. 901.)  On the WRAT-IV, Mr. Hsaio found that Plaintiff's overall academic performance varied from the 2nd to the 4th grade level.  (Tr. 903-904.)  Plaintiff was in the severe range of depression on the self-reported BDI.  (Tr. 903.)  Her FIRO-B results suggested that she was choosy about how, when, and where she associated with others.  (*Id.*)  Plaintiff did not attend appropriately and respond consistently on the PAI; therefore, her test results were considered invalid.  (*Id.*)

Mr. Hsiao's diagnostic impression included major depressive disorder (moderate, recurrent); anxiety disorder NOS; and BIF.  (Tr. 904.)  Mr. Hsiao concluded that while Plaintiff's full scale IQ score of 68 may be considered as part of a diagnosis of mild mental retardation, Plaintiff's interpersonal and work history did not provide sufficient evidence to document that she had significant deficits in adaptive functioning.  (*Id.*)  Mr. Hsiao noted, "[i]nstead, [Plaintiff's] mental health history of depression and anxiety suggest the possibility of chronic negative impact to her cognitive functioning.  Thus, current diagnosis of Borderline Intellectual Functioning is a better account of her current

7

cognitive functioning level."  (*Id.*)

### c.  Carol Krieger, CNS

On July 11, 2012, Ms. Krieger completed a Mental Questionnaire and Mental

Residual Functional Capacity Assessment.  (Tr. 1126-1128, 1130-1131.)  Ms. Krieger

had been Plaintiff's clinician since May 5, 2011, and had seen Plaintiff every eight

weeks.  (Tr. 1130.)  Ms. Krieger opined that Plaintiff was markedly limited in the

following areas: understanding, remembering, and carrying out detailed instructions;

maintaining attention and concentration for extended periods; performing activities

within a schedule, maintaining regular attendance, and being punctual within customary

tolerances; sustaining an ordinary routine without special supervision; working in

coordination with or proximity to others without being distracted by them; making simple

work-related decisions; and completing a normal workday and workweek without

interruptions from psychologically based symptoms and performing at a consistent pace

without an unreasonable number and length of rest periods.  (Tr. 1127.)  Ms. Krieger

advised that Plaintiff's lifelong diagnoses were "fairly" controlled with medication.  (Tr.

1131.)

### d.  Mark Hammerly, Ph.D.

On May 30, 2008, Mark Hammerly, Ph.D., a licensed psychologist, performed a

consultative evaluation of Plaintiff. (Tr. 370-379.)  Plaintiff reported that she lived on her

own and relied on food stamps and cash assistance for support.  (Tr. 370.)  She told Dr.

Hammerly that she was applying for Social Security Disability because "'Um...well, I

have anxiety and depression, and I'm bipolar.'" (*Id.*)  Plaintiff stated that she socialized

8

with friends everyday and described a normal frequency and quality of social interaction. (Tr. 371.)  She reported that she did all household duties including dishes, cooking, housecleaning, and laundry.  (Tr. 375.)  She stated that she went grocery shopping with her mother but could go alone if she had money and transportation.  (Tr. 375.)  Plaintiff reported improvement in her condition with medication.  (Tr. 372.)

Plaintiff's mood was normal and her affect was broad and reactive.  (Tr. 372, 375.)  Her mental control, concentration, and memory were grossly intact, although she exhibited mild problems concentrating and making change.  (Tr. 373.)  On the Wechsler Adult Intelligence Scale- Third Edition (WAIS-III), Plaintiff obtained a verbal IQ score of 71, a performance IQ score of 79, and a full scale IQ score of 73, which placed her IQ in the borderline range.  (Tr. 375-376, 379.)  Her estimated knowledge and ability to abstract similarities were in the low borderline range of intellectual functioning.  (Tr. 373-374.)  Dr. Hammerly's diagnostic impression included major depression (recurrent and in partial remission with medication and treatment) and BIF.  (Tr. 376-377.)  Dr. Hammerly described Plaintiff's functioning as follows: "[B]asically a friendly person, does all her own household and community [activities of daily living] with no assistance, has friends with whom she associates often, seeks out and utilizes community services on her own, and maintains a residence by herself without requiring outside assistance." (Tr. 376.)  Plaintiff's mental ability to relate to others, including fellow workers and supervisors, was not impaired; she could relate sufficiently to coworkers and supervisors for simple, repetitive tasks that did not require complicated or detailed verbal instructions or procedures.  (Tr. 377.)  Plaintiff's mental ability to understand, remember, and follow instructions was mildly impaired; however, she was capable of

9

comprehending and completing simple, routine, activities of daily living (ADL) tasks at home and in the community.  (*Id.*)  Plaintiff demonstrated mild problems with attention and concentration but her persistence and pace were appropriate for all clinical interactions.  (*Id.*)  Plaintiff had sufficient information, judgment, and common sense reasoning ability to live independently and to make important decisions concerning her future.  (Tr. 374.)  Plaintiff's mental ability to withstand the stress and pressures associated with day-to-day work activity was moderately impaired due to her BIF and depression.  (Tr. 377.)

**C.      Hearing Testimony**

**1.      Plaintiff's Hearing Testimony**

Plaintiff was 26-years-old at the time of her hearing.  (Tr. 55.)  She was 5'9" and weighed 392 pounds.  (*Id.*)  She lived on her own in Section 8 housing.  (Tr. 56.) Plaintiff was found eligible for special education services in 2nd grade.  (Tr. 57.) Plaintiff had difficulties reading and spelling; she could do simple addition and subtraction.  (Tr. 57-58.)

Plaintiff earned some money babysitting for a friend; she stopped in June 2012 because her friend did not want to pay her anymore.  (Tr. 58.)  She babysat for two months, where she worked from 7:00 a.m. to 2:00 p.m.  (Tr. 58-59.)  Plaintiff was convicted of "menacing" when she was 19-years-old.  (Tr. 371.)  She went to court in early 2012 to have her conviction expunged.  (Tr. 60.)  She was trying to find work through the Bureau of Vocational Rehabilitation (BVR), which told her that it would "look better" if her record was expunged because she was interested in working with children.

10

(Tr. 60.)

Plaintiff testified that she could stand for five or ten minutes before her back began hurting and her legs went numb.  (Tr. 61.)  She could sit in a cushioned chair for about an hour before she would have to shift positions.  (Tr. 61.)  She stated that she could not bend and touch her knees and that she would get out of breath walking up stairs.  (Tr. 62.)  She testified that she got along okay with other people.  (*Id.*) Plaintiff stated that she could not work because she got nervous in public and had problems with her back and legs.  (Tr. 63.)  She had diabetes which was controlled by medication.  (Tr. 64.)  She also had asthma which affected her ability to work outside and be in the heat.  (Tr. 65.)  Plaintiff suffered from depression, anxiety, and paranoia. (Tr. 65-66.)  She stated that she did not always take her medications as prescribed because she just "don't feel like it."  (Tr. 67.)

Plaintiff testified that her typical day consists of watching television and eating, and that she did not have the energy to leave the house unless she had an appointment.  (Tr. 68.)  She liked to watch Teen Mom, Hardcore Pawn, and The Kardashians, and stated that she was able to follow TV shows somewhat.  (Tr. 69.)

### 2.      Vocational Expert Testimony

Mr. Thompson, a vocational expert, testified at Plaintiff's hearing.  The ALJ asked the VE to consider a hypothetical individual vocationally situated as Plaintiff, who could perform all of the functions of light work except: occasional climbing of stairs; no climbing of ladders; occasional stooping greater than 90 degrees; no crawling; occasional overhead reaching; and occasional exposure to temperature extremes, pulmonary irritants, or hazards.  (Tr. 77.)  The individual could perform work that had a

11

specific vocational preparation (SVP) level of 1 to 2[1] where the pace of productivity was

not dictated by an external source over which the individual had no control, such as an

assembly line or conveyor belt.  (*Id.*)  The individual could have occasional contact with

the general public, coworkers, and supervisory authority.  (*Id.*)  The individual could

perform no tandem tasks with her coworkers.  (*Id.*)  The individual would be limited to

work requiring occasional decision-making and judgment that is repetitive from day to

day.  (*Id.*)  Reading, writing, and math should not be important.  (*Id.*)  Furthermore, the

work must be able to be performed in either a seated or standing position.  (Tr. 79.)

The VE testified that the hypothetical individual would be capable of performing such

jobs as a production inspector (Dictionary of Occupational Titles ("DOT") 724.685-014);

packager (DOT 559.687-074); and shipping weigher (DOT 222.387-074).  (Tr. 79.)

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she

establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y*

*of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered

disabled when she cannot perform "substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result

in death or which has lasted or can be expected to last for a continuous period of not

less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient

---

[1]     SVP ratings indicate how long it takes a worker to learn how to do his or
her job at an average performance level.  A rating of SVP 1 means a short
demonstration is the amount of training required to learn the job, and a
rating of SVP 2 means up to one month of training is required to learn the
job.

must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 *and* 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot,* 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education, or work experience.  20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

### IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.     The claimant has not engaged in substantial gainful activity since October 14, 2010, the application date.

2.     The claimant has the following severe impairments: obesity; diabetes mellitus, asthma; and L5-S1 anterolisthesis; borderline intellectual functioning; and major depressive disorder.

3.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

4.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform less than a full range of light work as defined in 20 CFR 416.967(b) except: occasional climbing of stairs; no climbing of ladders; occasional stooping to 90 degrees; never crawl; occasional overhead reaching; occasional exposure to temperature extremes, pulmonary irritants, or hazards; work that has an SVP of 1 to 2 where the pace of productivity is not dictated by an external source over which she has no control such as an assembly line or conveyor belt; occasional contact with general public and coworkers but can perform no tandem tasks with her coworkers; occasional contact with supervisory authority; work that requires occasional decision-making and judgment that is repetitive from day to day; reading, writing, and math should not be important; and work that can be performed in either a seated or standing position.

5.     The claimant has no past relevant work.

6.     The claimant was born in November 1985 and was 24-years-old, which is defined as a younger individual age 18-49, on the date the application was filed.

7.     The claimant has a marginal education and is able to communicate in English.

8.     Transferability of job skills is not an issue because the claimant does not have past relevant work.

9.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

10.    The claimant has not been under a disability, as defined in the Act, since October 14, 2010, the date the application was filed.

(Tr. 22-39.)

**V. LAW & ANALYSIS**

### A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ.  *Id.*  However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

15

**B.**     **Plaintiff's Assignments of Error**

### 1.  The ALJ Erred in Failing to Adequately Account for Plaintiff's Low Intellectual Functioning.

Plaintiff argues that substantial evidence does not support the ALJ's RFC determination, because the ALJ did not accurately account for Plaintiff's low intellectual functioning when presenting the hypothetical question to the VE.  According to Plaintiff, the ALJ should have informed the VE that Plaintiff's reading skills were at a 4th grade level and her math skills were at a 2nd grade level.  Instead, the ALJ told the VE that the hypothetical individual would be limited to jobs where "reading, writing, and math should not be important."  (Tr. 77.)  Plaintiff maintains that the restriction the ALJ posed to the VE was not specific enough.  For the following reasons,  Plaintiff's argument is not well taken.

At Plaintiff's hearing, the ALJ presented a hypothetical to the VE which included the following limitations, among others: "[N]o work [where] the pace of productivity is dictated by an external source, over that which the individual has no control such as an assembly line or conveyor belt. . . .  Reading, writing and math should not be important."  (Tr. 77.)  The VE testified that an individual with such restrictions could perform work as an a production inspector (DOT 724.685-014), packager (DOT 559.687-074), and shipping weigher (DOT 222.387-074).  (Tr. 79.)

 In addition to listing the duties of numerous occupations, the DOT also describes various characteristics of each occupation.  Included in these characteristics is the General Educational Development level ("GED"), which "embraces those aspects of education (formal and informal) which are required of the worker for satisfactory job

16

performance."  *See* DOT, Appendix C, available at

www.oalj.dol.gov/public/dot/references/dotappc.htm (last visited October 31, 2014).  An

occupation's GED level consists of three measures: reasoning development;

mathematical development; and language development.  *Id*.  The reasoning, math, and

language levels that correspond to the jobs the ALJ found Plaintiff capable of

performing are as follows:

- **Production Inspector:** Reasoning 2; Math 1; Language 1[2]
- **Packager:** Reasoning 2; Math 1; Language 2[3]
- **Shipping Weigher:** Reasoning 3; Math 2; Language 1[4]

The DOT describes a level 1 math level as follows:

> Add and subtract two-digit numbers. Multiply and divide 10's and 100's by 2, 3, 4, 5. Perform the four basic arithmetic operations with coins as part of a dollar. Perform operations with units such as cup, pint, and quart; inch, foot, and yard; and ounce and pound.

The DOT describes a level 2 math level as follows:

> Add, subtract, multiply, and divide all units of measure. Perform the four operations with like common and decimal fractions. Compute ratio, rate, and percent. Draw and interpret bar graphs. Perform arithmetic operations involving all American monetary units.

The DOT describes a level 1 language level as follows:

> READING: Recognize meaning of 2,500 (two- or three-syllable) words. Read at rate of 95-120 words per minute.

---

[2]  DICOT 724.685-014 (G.P.O.), 1991 WL 679550.

[3]  DICOT 559.687-074 (G.P.O.), 1991 WL 683797.

[4]  DICOT 222.387-074 (G.P.O.), 1991 WL 672108.

> Compare similarities and differences between words and between series of numbers.

The DOT described a level 2 language level as follows:

> READING: Passive vocabulary of 5,000-6,000 words. Read at rate of 190-215 words per minute. Read adventure stories and comic books, looking up unfamiliar words in dictionary for meaning, spelling, and pronunciation. Read instructions for assembling model cars and airplanes.

Here, Plaintiff argues that the ALJ should have been more specific in presenting Plaintiff's educational limitations to the VE.  Plaintiff does not, however, explain how Plaintiff's 4th grade reading ability and 2nd grade math ability[5] affect her ability to perform the jobs assigned by the VE, particularly the production inspector job, which requires the lowest math and language levels.  Thus, in presenting her first assignment of error, Plaintiff skips a vital step in her analysis; that is, she fails to demonstrate how an individual with a 4th grade reading level and 2nd grade math level is incapable of performing jobs where reading, writing, and math are not important. Additionally, Plaintiff has made no showing that the reasoning, math, and language levels of the production inspector, packager, and shipping weigher jobs exceed the ALJ's RFC.  While Plaintiff argues that the ALJ erred in not specifically describing Plaintiff's intellectual restrictions when presenting the hypothetical to the VE, she fails to

---

[5]     As the ALJ noted in her opinion, there is evidence in the record that Plaintiff performed at a 6th grade reading level, a 5th grade reading level, a 3rd grade math level, and a 5th grade math level at various times in her school career.  (Tr. 27-28, 331, 333, 343, 347.)  Thus, it appears that in describing Plaintiff's reading ability as a 4th grade level and her math ability as a 2nd grade level, Plaintiff has cherry-picked the evidence without acknowledging that other assessments of Plaintiff's reading and math levels exist in the record.

18

explain how that error actually prejudiced the outcome of her case.  Counsel is reminded of the necessity of demonstrating that an error caused harm in order to prevail on review.  A remand is not predicated upon the number of errors raised; rather it is based upon errors that are material and significant that affect the outcome of the case and the reliability of the ALJ's decision.  It is counsel's obligation to fully brief the errors presented to the Court, as this Court can deem waived those issues that are raised in only a perfunctory manner.  *See Rice v. Comm'r of Soc. Sec.*, 169 F. App'x 452, 454 (6th Cir.2006) ("It is well-established that 'issues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'") (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995–996 (6th Cir.1997)). Plaintiff has failed to demonstrate that the jobs of a production inspector, packager, or shipping weigher could not be performed by an individual with a 4th grade reading level and 2nd grade math skills.  Accordingly, Plaintiff's first assignment of error does not present a basis for remand.

### 2. The ALJ Erred in Failing to Adequately Account for Plaintiff's Marked Restriction in Maintaining Concentration, Persistence, or Pace.

Plaintiff argues that the ALJ properly found that she had marked[6] difficulties in maintaining concentration, persistence, or pace, but failed to adequately account for those limitations in Plaintiff's RFC.  The Commissioner inconsistently argues first that "the ALJ did not pose a 'marked' restriction as Plaintiff's [sic] argues," and second that

---

[6]     A "marked" limitation means a limitation that is "more than moderate" but "less than extreme."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C).

Plaintiff could perform work within her RFC "despite her marked restriction in concentration, persistence, or pace." (Defendant's Brief ("Def.'s Br.") at 18.)  The briefing from both parties on this issue is somewhat confusing.  Moreover, the ALJ's opinion, while making a general statement that Plaintiff was markedly limited in concentration, persistence, or pace, includes specific and detailed analysis rejecting a marked limitation in this area.  After carefully reviewing the ALJ's opinion as a whole, the Court concludes that the ALJ considered Plaintiff, at most, *moderately* impaired in this area, as discussed in more detail below.

At Step Three of the sequential evaluation process, the ALJ's decision notes that "[w]ith regard to concentration, persistence, or pace, the claimant has marked difficulties." (Tr. 25.)  The ALJ, however, immediately followed that finding with this description of Plaintiff's abilities that directly contradicts a marked limitation:

> As discussed in greater detail below, the medical evidence from Harbor has consistently shown that the claimant's memory, attention, and concentration are intact. The claimant was able to maintain her attention during the hearing that lasted over one hour and answered completely without significant hesitation or problem all questions posed to her.

(*Id.*)  Describing Plaintiff's memory, attention, and concentration as "consistently intact" reflects, at most, a moderate or mild, rather than marked, restriction in Plaintiff's ability to maintain concentration, persistence, or pace.

Furthermore, the ALJ's evaluation of the opinion evidence in the record shows that the ALJ did not consider Plaintiff markedly limited in concentration, persistence, or pace.  In determining Plaintiff's RFC, the ALJ relied heavily on the opinions of psychology trainee Wei-Chen Hsiao and Mark Hammerly, M.D.  Mr. Hsiao noted that

Plaintiff's attention and concentration were good throughout testing, and Dr. Hammerly unequivocally concluded that Plaintiff had only *mild* problems with attention and concentration and that her persistence and pace were appropriate for all clinical interactions.  (Tr. 900.)  The ALJ discussed the opinion evidence at length and concluded that despite Plaintiff's testimony regarding her inability to follow television shows and her need for help with laundry, "the evidence shows . . . that the records reported consistently that the claimant's attention and concentration were intact and no issues in this area were reported by her treating sources including Mr. Hsiao and that Dr. Hammerly only noted mild problems with both concentration and making change."  (Tr. 35.)  The ALJ relied on the opinions of Mr. Hsaio and Dr. Hammerly in determining Plaintiff's RFC, and both of those opinions indicate that Plaintiff was not markedly limited in concentration, persistence, or pace.

Moreover, it appears that the only source in the record who opined that Plaintiff was markedly restricted in maintaining attention and concentration was Carol Kreiger.  The ALJ explicitly found that Ms. Krieger *was not an acceptable medical source* and that her opinion was entitled to limited weight.  (Tr. 36, 1127.)  In rejecting Ms. Kreiger's opinion and explicitly rejecting a marked limitation, the ALJ stated that "[t]he issue relative to [Plaintiff's] attention and concentration are not supported by the medical evidence that routinely found her attention, concentration, and memory to be intact.  Further, the evidence does not reflect 'marked' limitations as stated by Ms. Krieger and she has not provided clinical support of her suppositions and the record and the claimant's activities also do not reflect such severe limitations."  (Tr. 36.)  Thus, the ALJ explicitly rejected the only opinion in the record that described Plaintiff as markedly

limited in concentration, persistence, or pace, and repeatedly described Plaintiff's ability in this area as "intact."

In summary, the ALJ's opinion includes a single, isolated remark that Plaintiff's ability to maintain concentration, persistence, or pace was "markedly" limited, but the whole of the ALJ's opinion includes a detailed analysis rejecting such a conclusion and, instead, accepting at most a moderate limitation in this area.  While the case could be remanded for clarification of this issue, this Court believes a remand for this purpose would be an exercise in futility, because the ALJ's intention is clear.  When "remand would be an idle and useless formality," courts are not required to "convert judicial review of agency action into a ping-pong game."  *Kobetic v. Comm'r of Soc. Sec.*, 114 F. App'x 171, 173 (6th Cir. 2004) (quoting *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766, n.6 (1969)).

Finally, in addressing Plaintiff's limitations with regard to concentration, persistence, or pace, the ALJ restricted Plaintiff to "work that has an SVP of 1 or 2 where the pace of productivity is not dictated by an external source over which she has no control such as an assembly line or conveyor belt," and "work that requires occasional decision-making and judgment that is repetitive from day to day."[7]  (Tr. 26.) Plaintiff concedes in her Brief that the ALJ's RFC is sufficient to account for a moderate limitation in maintaining concentration, persistence, or pace.  (Plaintiff's Brief ("Pl.'s Br.") at 18-20.)  Thus, although the ALJ's decision indicates that she considered Plaintiff only *mildly* or, at most, *moderately* impaired in concentration, persistence, or pace, the ALJ's

---

[7]  The ALJ presented these same restrictions to the VE in the form of a hypothetical.  (Tr. 77.)

RFC adequately accounts for Plaintiff's limitations.  Accordingly and for the foregoing reasons, Plaintiff's second assignment of error does not present a basis for remand.

### 3.    The ALJ Erred in Evaluating Plaintiff's IQ Scores.

Plaintiff generally argues that the ALJ improperly assessed Plaintiff's IQ scores, particularly with respect to whether Plaintiff satisfied Listing 12.05(C), which, *inter alias*, requires a full scale IQ score of 60 through 70.  Specifically, Plaintiff contends that the ALJ improperly rejected Plaintiff's IQ score of 68 without providing reasons for doing so, and that she erred by substituting her lay opinion for a physician's opinion.  Plaintiff's arguments lack merit, because substantial evidence supports the ALJ's assessment of Plaintiff's September 2011 IQ score of 68.

In her discussion of Listing 12.05(C), the ALJ noted that Plaintiff had an IQ score within the required range, but determined that it was not valid:

> The medical evidence does not present a valid verbal, performance, or full scale IQ score of 60 through 70 although the undersigned does acknowledge that a full scale IQ of 68 was found in September 2011.  However, while such a score was rendered, Wei-Chen Hsiao, psychology trainee, approved by Melissa K. Lanza, Ph.D., PCC, found no adaptive deficits and rendered a diagnosis of borderline intellectual functioning (Exhibit C15F).  This is confirmed by the claimant's testimony that she has resided alone since 2006, cares for her personal needs, does limited cooking, and performs household tasks.  She also uses public transportation, goes to medical appointments, and has babysat.  Further, intellectual testing performed when she was approximately 12 years of age, resulted in a full scale IQ of 77 and testing performed in 2008 resulted in a full scale IQ of 73.

(Tr. 26.)    Later in her decision, the ALJ discussed the various IQ score results--all above 70–contained in records from Toledo Public Schools:

23

- In 1993, Plaintiff obtained WISC-III verbal, performance, and full scale IQ scores of 84, 83, and 83, respectively. (Tr. 28, 347.)

- In 1995, Plaintiff obtained WISC-III verbal, performance, and full scale IQ scores of 78, 79, and 76, respectively. (Tr. 28, 347.)

- In 1997, Plaintiff obtained WISC-III verbal, performance, and full scale IQ scores of 76, 81, and 77. (Tr. 28, 347.)

The ALJ further acknowledged that in May 2008, Plaintiff obtained a verbal IQ score of 71, a performance IQ score of 79, and a full scale IQ score of 73. (Tr. 38, 379.)

The ALJ's decision to reject Plaintiff's isolated IQ score of 68 for purposes of determining whether she met the criteria for Listing 12.05(C) was supported by substantial evidence in the record. First, as discussed above, there are numerous other full scale IQ scores in Plaintiff's record that are above the 60-70 range. The ALJ noted that "[w]hile intelligence testing done in September 2011 resuled [sic] in a full scale IQ of 68, prior testing, as discussed above, showed full scale IQ scores of 77 in 1997 and 73 in May 2008." (Tr. 35.) Furthermore, as the ALJ explained, Mr. Hsiao, who conducted a psychological evaluation of Plaintiff in 2011, specifically noted that while Plaintiff's IQ score of 68 might be considered as part of a diagnosis of mild mental retardation, her interpersonal working history did not provide sufficient evidence to document significant deficits in adaptive functioning.[8] (Tr. 30, 904.) Mr. Hsaio recommended that Plaintiff would

---

[8]      The notes from Mr. Hsaio's psychological evaluation specifically state:

It should be noted that although [Plaintiff's] Full Scale IQ score of 68 may be considered as part of a diagnosis of Mild Mental Retardation, [Plaintiff's] interpersonal and working history did not provide sufficient evidence to document that she has significant deficits in adaptive functioning. Instead, her mental health history of depression and anxiety suggest the possibility

benefit from a work setting that provided clear, direct, and easy to understand instructions; routine tasks; and work in an environment that included plenty of independent activities and work on a team that allowed her to have individual follow-through. (*Id.*) Thus, contrary to Plaintiff's assertion, the ALJ did not substitute her own judgment for the medical judgment of a physician, as the ALJ's assessment of Plaintiff's IQ of 68 aligns with the opinions of psychology professionals.  Mr. Hsaio concluded in his psychological assessment, which was approved by Dr. Lanza, that despite Plaintiff's IQ score of 68, her interpersonal and working history suggested that she did not have significant deficits in adaptive functioning, and that a diagnosis of BIF better accounted for her cognitive functioning level.

Furthermore,  the ALJ did not discount Plaintiff's IQ score of 68 without explanation, as she specifically observed that objective evidence in the record as well as Plaintiff's own testimony indicates that Plaintiff's intellectual functioning has not caused deficits in her adaptive functioning.  For example, the ALJ noted that Plaintiff resided in an apartment alone since 2006 and was capable of living independently.  (Tr. 24, 26-27, 56.) While Plaintiff testified that her mother was highly supportive and monitored her regularly, Plaintiff did not have a legal guardian and no social agency monitored her household.  (Tr. 35.) Plaintiff testified that she cared for her personal needs, did limited cooking, performed household tasks, used public transportation, and babysat for a friend.  (Tr. 26.)  Dr. Hammerly found that Plaintiff "is basically a friendly person, does all her own household

---

of chronic negative impact to her cognitive functioning.  Thus, current diagnosis of Borderline Intellectual Functioning is a better account of her current cognitive functioning level.

(Tr. 904.)

and community ADL's with no assistance, has friends with whom she associates often, seeks out and utilizes community services on her own, and maintains a residence by herself without requiring outside assistance." (Tr. 376.)  Accordingly, substantial evidence supports the ALJ's conclusion that although Plaintiff had one full scale IQ score between 60 and 70, she did not have the significant deficits in adaptive functioning required to meet Listing 12.05(C).  For the foregoing reasons, Plaintiff's third assignment of error does not present a basis for remand of her case.

### 4.    The ALJ Did not Properly Consider Plaintiff's Obesity in Determining her RFC.

Plaintiff argues that the ALJ did not consider her obesity in accordance with SSR 02-1p when determining her RFC.  The Social Security Administration ("SSA") considers obesity to be a medically determinable impairment.  S.S.R. 02-1p, Introduction, 2000 WL 628049, at *1 (S.S.A.).  Although the Listings previously included obesity as an impairment, the SSA deleted it in 1999, and added paragraphs to the prefaces of the musculoskeletal, respiratory, and cardiovascular body system listings that provide guidance about the potential effects obesity has in causing or contributing to impairments in those body systems.  *Id.*  The SSA also recognizes that obesity may cause or contribute to mental impairments such as depression or the loss of mental clarity due to obesity-related sleep apnea.  S.S.R. 02-1p, Policy Interpretation Question 2, 2000 WL 628049, at *3.

Plaintiff contends that "the ALJ has failed to show how in any way how [sic] obesity factored in as a severe impairment."  (Pl.'s Br. at 25.)  But Social Security Ruling 02-01p does not mandate a particular mode of analysis of obesity, as it states only that obesity, in combination with other impairments, "may" increase the severity of the other limitations.

*Bledsoe v. Barnhart*, 165 F. App'x 408, 411-12 (6th Cir. 2006) ("It is a mischaracterization to suggest that Social Security Ruling 02-01p offers any particular procedural mode of analysis for obese disability claimants.").  Accordingly, to the extent that Plaintiff argues that the ALJ violated Social Security Ruling 02-01p by failing to perform an analysis of Plaintiff's obesity in a particular manner, this argument lacks merit.

Moreover, the ALJ's decision reflects that she considered Plaintiff's obesity at the relevant steps of the sequential analysis.  An ALJ must compare the medical evidence with the requirements for impairments in the Listings when considering whether a claimant's impairments, either singly or in combination, meet or medically equal any impairments in the Listings, *Reynolds v. Comm'r of Soc. Sec.*, 414 F. App'x 411, 414 (6th Cir. 2011), and the ALJ must consider all of a claimant's impairments, severe and not severe, when assessing the claimant's RFC, *see* 20 C.F.R. § 404.1545(e).  Here, as the ALJ observed, there is no evidence that Plaintiff was assigned limitations based on her obesity.  The ALJ specifically noted that "the record contains no indication that the claimant suffers any limitations or symptoms because of her obesity that impact her other impairments to such a degree that they would meet or equal a listing."  (Tr. 24.)  The ALJ found Plaintiff's obesity to be a severe impairment, and explained that Plaintiff's impairments, considered both singly and in combination, did not meet or medically equal the requirements of any of the impairments set forth in the Listings regarding major dysfunction of a joint (Listing 1.02); disorders of the spine (Listing 1.04); asthma (Listing 3.03); endocrine disorders (Listing 9.00); and peripheral neuropathies (Listing 11.14).  (Tr. 25-26.)  Plaintiff has not explained what evidence regarding obesity the ALJ failed to consider and how that evidence supports her claims for disability.

Furthermore, not only does the ALJ's analysis indicate that she considered the effect of Plaintiff's obesity on her ability to function, the ALJ's RFC finding accounts for Plaintiff's obesity by limiting her to less than a full range of light work; giving her a sit/stand option; and requiring that she never crawl and climb ladders and only occasionally climb stairs, stoop to 90 degrees, reach overhead, and be exposed to temperature extremes, pulmonary irritants, or hazards.  (Tr. 26.)  Accordingly and for the foregoing reasons, Plaintiff's fourth assignment of error does not present a basis for remand of her case.

## VI.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: November 7, 2014

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**

28